**Candice ROARK, Plaintiff,**

v.

**KIDDER, PEABODY & CO.,
INC., Defendant.**

Civ.A. No. 3:96–CV–2089–P.

United States District Court,
N.D. Texas.
Dallas Division.

April 9, 1997.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Now before the Court are:

1. Motion of Defendant Kidder, Peabody & Co., Inc. for Summary Judgment, filed January 31, 1997;

2. Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment, filed February 20, 1997;

3. Reply of Defendant to Plaintiff's Response, filed March 7, 1997; and

4. Defendant's Objections and Motion to Strike Plaintiff's Summary Judgment Evidence, filed March 7, 1997.

Having considered the complaint, the record, the memoranda of the parties and the applicable law, the motion for summary judgment is GRANTED on the claims of intentional infliction of emotional distress and hostile work environment and DENIED as to the retaliation claim for reasons set forth below.

## I. BACKGROUND

This is a suit by Plaintiff, Candice Roark, against her former employer, Defendant, Kidder, Peabody & Co. ("Kidder"), for unlawful sexual discrimination pursuant to Tex. Labor Code Chapter 21, based on theories of a hostile work environment and retaliation. There is also a common law claim for intentional infliction of emotional distress.

The Plaintiff's complaint is based on the following events. In February of 1994, Candice Roark began working at Kidder's Dallas office as an unregistered, securities sales assistant. On two separate occasions in the Spring of 1994, Pat McLochlin, the branch manager of the Dallas office, hugged the Plaintiff. (Plaintiff Depo. at 270.) Plaintiff describes the hugs as non-sexual and says she was not offended when they occurred. (Plaintiff Depo. at 274–76.) In October of 1994, McLochlin remarked to a temporary worker that "Gloria and Candi (Plaintiff) are great people if you can keep them sober." (Plaintiff Depo. at 217.) A few days later McLochlin said to Plaintiff in

regard to her attire that, "Those boots have 1–900 numbers written all over them. Now I know how you really make your money with your brokers." (Plaintiff Depo. at 205.) This comment was made in the presence of co-workers and a client. (Plaintiff Aff. ¶ 11.) Plaintiff felt "severely humiliated and embarrassed." (Plaintiff Aff. ¶ 11.) These are the only offensive statements alleged to have been made by McLochlin. (Plaintiff Depo. at 228–29.) McLochlin claims that both his statements were mere jokes. (McLochlin Depo. at 58.) Plaintiff also claims that she began to feel intimidated in the office due to a series of alleged conversations between Plaintiff and co-worker Kathy Davis. (Plaintiff's Brief at 3–4.) Davis allegedly told Plaintiff that McLochlin frequently forced her to engage in "unwanted hugs." (Plaintiff Aff. ¶ 9.) However, Davis testifies that she told Plaintiff that she had "never been sexually harassed by Mr. McLochlin and . . . [she] did not find Mr. McLochlin's actions toward her offensive or inappropriate." (Davis Aff. ¶ 7.) Davis further testifies that the hugs between her and McLochlin "were merely an expression of friendship." (Davis Aff. ¶ 8.)

Shortly after the "boots" incident in October of 1994, Plaintiff told McLochlin that she was offended by his conduct and wanted him to refrain from making offensive comments about her. Plaintiff cannot recall if McLochlin apologized or made any meaningful response. (Plaintiff Aff. ¶ 12.) However, Plaintiff acknowledges that McLochlin never hugged her or made any statements of a sexual nature to her after this conversation. (*See* Plaintiff Depo. at 494.)

Plaintiff claims that from that day forward McLochlin engaged in a campaign of retaliation against her. (Plaintiff Aff. ¶ 14.) On approximately four occasions, Plaintiff placed trade correction documents, in need of a supervisor's authorization, on McLochlin's desk. (Plaintiff Depo. at 231.) On each occasion, McLochlin went home for the day without signing the documents. The Plaintiff retrieved the forms and had them signed by the assistant manager. (Plaintiff Depo. at 234.) Plaintiff asserts that McLochlin's failure to promptly sign the documents dem-

onstrates that she was singled out for unfavorable treatment. ·(Plaintiff Aff. ¶ 15.) However, Plaintiff is unable to specify any instance when McLochlin treated any other worker differently in regard to his signing of trade corrections. (Plaintiff Depo. at 238.) The Plaintiff was also reprimanded for making an error on a trade ticket. (Plaintiff Aff. ¶ 15.) Kidder claims that on this instance, Plaintiff took a trade order despite her unregistered status, which is a violation of company policy and a possible violation of SEC regulations. The trade was also improperly placed and resulted in a $500 loss for Kidder. (Defendant's Brief at 8.) Plaintiff asserts that co-workers commonly make this mistake without being subject to reprimand. (Plaintiff Aff. ¶ 15.) However, Plaintiff does not produce any evidence or corroborating testimony to support this allegation. Plaintiff additionally claims that on some occasion or occasions (Plaintiff does not specify), McLochlin walked toward her while she was speaking to co-workers. McLochlin addressed the co-workers by name and ignored the Plaintiff. (Plaintiff Aff. ¶ 14.)

On Thursday, October 27th, Plaintiff contacted Patricia Carday, Senior Vice President of Kidder's Human Resources department in New York. (Plaintiff Aff. ¶ 17.) Plaintiff complained to Carday about McLochlin's behavior, including the two hugs, the two offensive comments and the reprimand for the erroneous trade order. (Carday Aff. ¶¶ 5, 7.) Carday claims that she subsequently conducted an investigation which included speaking to McLochlin, Alexis Kebrdle (Plaintiff's immediate supervisor), and Steve Goddard (McLochlin's supervisor). (Carday Aff. ¶¶ 8, 11.) Carday testifies that McLochlin assured her that he would not make any offensive comments in the future. Additionally, Carday reminded McLochlin to be conscious of even the perception of offensiveness. ·(Carday Aff. ¶¶ 9, 10.)

On Friday, October 28th, McLochlin called the Plaintiff into his office. Alexis Kebrdle was also present at this meeting. McLochlin and Plaintiff discussed the sexual harassment allegations. Plaintiff claims that McLochlin became·very angry and yelled and screamed at her and called her selfish. Plaintiff was

frightened and upset, and began crying. Plaintiff felt nauseated and feared that her heart would fail (Plaintiff wears a pacemaker; a fact of which McLochlin was aware.). (Plaintiff Aff. ¶ 5.) While still crying, Plaintiff ran out of McLochlin's office. (Plaintiff Aff. ¶¶ 18, 19.)

After leaving McLochlin's office, Plaintiff immediately ran down 39 flights of stairs and telephoned a Kidder Human Resources representative. (Plaintiff Depo. at 280–82.) When the phone conversation was over, Plaintiff exited the building and fainted. After she regained consciousness, an ambulance arrived and took her to the hospital. (Plaintiff Depo. at 289.) Plaintiff was released from the hospital the same day. (Plaintiff Aff. ¶ 20.)

On Monday, October 31st, Plaintiff claims she returned to work and discovered that McLochlin had been spreading untrue and vengeful rumors about her. (Plaintiff Aff. ¶¶ 21, 22.) These rumors were allegedly told to co-workers Kevin Dickey, Larry Wright and Troy Randolph. Plaintiff produces no affidavits from Dickey, Wright or Randolph, and no other evidence of any rumors other than her own allegations.

On Tuesday, November 1st, Plaintiff spoke with two Kidder Human Resources employees, one of whom was Patricia Carday. Plaintiff complained about McLochlin's rumor campaign. Carday said that she would mail Plaintiff a copy of Kidder's sexual harassment policy. (Plaintiff Aff. ¶¶ 22–25.)

On Thursday, November 3rd, Carday called the Plaintiff and informed her that senior management had been advised of her complaint and McLochlin had been reminded to abide by Kidder's sexual harassment policy. (Carday Aff. ¶ 13.) Plaintiff complained that McLochlin was retaliating against her. Carday claims that Plaintiff did not articulate what was meant by retaliation and her complaint was therefore difficult to understand. Carday asked Plaintiff to write down the instances of retaliation to facilitate a further investigation.

Friday, November 4th, was the last day that Plaintiff reported to work. Plaintiff claims that during a phone conversation with Kidder Human Resources employee, Bobby Allison, Allison asked Plaintiff if she would resign if given a $4,000 bonus plus severance pay. (Plaintiff Aff. ¶ 30.) Plaintiff told Allison "I can't stay here, my health is too bad, but if I leave then, then [McLochlin] will slander me." (Plaintiff Depo. at 360.) Plaintiff further testifies that "I honestly believed it was my health or else, so I had to leave." (Plaintiff Depo. at 142.) Plaintiff says that "I told [Allison] that I would consider the offer, but that I was very concerned about the [proposed letter of] recommendation. I did not want a recommendation from Pat McLochlin." (Plaintiff Aff. ¶ 30.) Later that same day, November 4th, Plaintiff spoke with Carday. Plaintiff claims that Carday offered her a resignation package. (Plaintiff Aff. ¶ 31.) Carday claims that she raised the resignation issue because Allison told Carday that Plaintiff wanted to resign. (Carday Aff. ¶ 15.) During Plaintiff's conversation with Carday it was agreed that Carday would send Plaintiff a separation agreement that contained the terms discussed. (Plaintiff Aff. ¶ 31.) Carday claims Plaintiff was "unequivocal in her decision to leave Kidder" and she believed that Plaintiff had resigned her position, effective November 4, 1994. (Carday Aff. ¶¶ 16, 17.)

Following the November 4th, conversation with Plaintiff, Carday informed McLochlin and Alexis Kebrdle that Plaintiff resigned. Carday also had Kidder's legal department prepare a Separation Agreement and Release, which was mailed to Plaintiff. (Carday Aff. ¶¶ 19, 20.) This agreement specifies that "I understand that as of November 4, 1994 my active employment with Kidder will terminate." (Separation Agreement and Release at 1, attached as Exhibit 5 to Plaintiff Depo.) Plaintiff never signed this agreement. She instead had an attorney prepare a revised Agreement and Release, which Plaintiff signed and faxed to Kidder. (Plaintiff Aff. ¶ 34.) Plaintiff's revised agreement refers to the "termination of the Employee on November 4, 1994." (Agreement and Release at 1, attached as Exhibit 4 to Plaintiff Depo.) Plaintiff included a note along with the revised agreement stating that "I was under the impression termination was only in effect providing I signed the release." (Letter

from Plaintiff to Carday of 11/08/94, attached as Exhibit 3 to Plaintiff Depo.)

Plaintiff called in sick to work on Monday, Tuesday, Wednesday and Thursday, November 7, 8, 9, and 10. Plaintiff testifies that she "had every intention of returning" but she would not return "without anyone resolving the [harassment] issue." (Plaintiff Depo. at 394, 392.) On Thursday, November 10th, Plaintiff spoke with a Kidder human resources representative who told her not to go to work the next day. (Plaintiff Aff. ¶ 36.) On Friday, November 11, Plaintiff received a letter from Kidder stating that her resignation had been accepted, although Plaintiff claims she never resigned. That same day, Plaintiff called Kebrdle, who informed the Plaintiff that she would not be allowed to enter the office. (Plaintiff Aff. ¶¶ 37, 38.).

On Wednesday, November 16th, Plaintiff's husband accepted a job offer, made earlier that month, to work in Minnesota. (Steven Roark Depo. at 31.) Plaintiff and her family moved to Minnesota on Wednesday, November 23, 1994. (Plaintiff Depo. at 138.) Plaintiff has since held jobs with Arch Financial and Prudential Securities. (Plaintiff Depo. at 449–50.) This action was commenced on January 11, 1996.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Once the movant satisfies this burden, the nonmovant must come forward with evidence to support the essential elements of its claim. *Celotex,* 477 U.S. at 321–23, 106

S.Ct. at 2551–53. No genuine issue of material fact exists if a rational trier of fact could not find for the nonmovant based on the evidence presented. *Id.*

The evidence must be viewed in a light most favorable to the nonmovant. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. "Conclusory allegations unsupported by specific facts, however, will not prevent the award of summary judgment." *National Ass'n of Gov't Employee's v. City Pub. Serv. Bd.,* 40 F.3d 698, 713 (5th Cir.1994). A plaintiff must produce probative evidence tending to support the complaint. *Id.* Summary judgment is properly granted if after adequate time for discovery, the nonmovant fails to present evidence needed to support the existence of an element essential to his case. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

### B. Plaintiff's Claims Present No Genuine Issue of Material Fact

#### 1. Hostile Work Environment

■ Plaintiff's sexual harassment claims are based on the Texas Commission on Human Rights Act ("TCHRA"). One of the purposes of the TCHRA is to "provide for the execution of the policies of Title VII." Tex. Lab.Code § 21.001. "Therefore, consistent with the TCHRA's general policy, it is interpreted in a manner consistent with Title VII." *Humphreys v. Medical Towers, Ltd.,* 893 F.Supp. 672, 691 (S.D.Tex.1995).

To state a claim for gender discrimination based on a theory of hostile work environment, a plaintiff must prove (1) that she belongs to a protected class, (2) that she was subject to unwelcome harassment, (3) that the harassment was based on sex, (4) that the harassment affected a term, condition or privilege of employment, and (5) that the employer knew or should have known about the harassment and failed to take prompt remedial action. *Long v. Eastfield College,* 88 F.3d 300, 309 (5th Cir.1996). To give rise to a cause of action, the questioned conduct must create an environment that a reasonable person would find hostile or abusive. *Id.* A hostile environment has been described as one "so heavily polluted with discrimination as to destroy completely the emotional

and psychological stability of minority group workers." *Vaughn v. Pool Offshore Co.,* 683 F.2d 922, 924 (5th Cir.1982) (quoting *Rogers v. Equal Emp. Oppty. Comm.,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972)). The factors used to determine whether an environment is hostile include "the frequency of the conduct, the severity of the conduct, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance." *Id.* (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

■ The only conduct that Plaintiff claims constituted sexual harassment toward her are the two non-sexual hugs in the Spring of 1994 and the two offensive jokes in October of 1994. (Plaintiff Interrog. Nos. 6, 8.) Plaintiff says that the hugs were not offensive to her when they occurred, however they were offensive to her in retrospect due to an extensive series of conversations with Kathy Davis in which Davis supposedly spoke of several unwanted hugs from McLochlin that put Davis in fear and made her cry. In Davis' deposition and affidavit she denies ever telling plaintiff that McLochlin's hugs were inappropriate. Davis further testifies the hugs were "completely innocent as friends." (Davis Depo. at 27.) For summary judgment purposes, the Court will resolve the difference between Plaintiff's and Davis' testimony in favor of Plaintiff, in order to determine Plaintiff's state of mind. The Court will not examine Plaintiff's hearsay allegations to determine if Plaintiff was indeed harrassed. *See* Fed.R.Evid. 801(c).

■ Two hugs and two jokes do not constitute conduct of the level necessary to maintain a claim for sexual harassment. As stated in *Long v. Eastfield College,* a joke "is exactly the type of mere offensive utterance which should not, by itself, support a claim for hostile work environment." 88 F.3d at 309. If one joke cannot support a claim, the addition of a mere second joke will not so heavily pollute the work-place as to create a cause of action.

Further examples of conduct that is insufficient to support a claim are shown in *DeAn-gelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591 (5th Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995), and *Gearhart v. Eye Care Centers of Am., Inc.,* 888 F.Supp. 814 (S.D.Tex.1995). In *DeAngelis,* a female sergeant with the El Paso police force, complained of comments made in ten editorial columns published in the police association newsletter. Each newsletter was circulated to over 700 of the sergeant's colleagues. *DeAngelis,* 51 F.3d at 592. Examples of the comments about which the plaintiff in *DeAngelis* complained include: "I remember the good ol' days when finding the criminal was more important than keeping your hair in place! ... Do you remember when there were no women working the streets? (Ah yes those were the good days! ... Sorry gals, truth hurts!) ...." and "I was surprised to think they were also training some good lookin' K–9s up there but I was told those were the female recruits! I swear! Complete with collars! oh well, my mistake!" *Id.* at 594. The Fifth Circuit held that the newsletter columns "were not so frequent, pervasive, or pointedly insulting to [plaintiff] as to create an objectively hostile working environment." *Id.* at 597. In *Gearhart,* where a plaintiff complained that, during a six week period, a male supervisor and another male employee made a variety of inappropriate remarks and the non-supervisory employee touched her in an offensive manner on several occasions, these allegations were insufficient, as a matter of law, to establish a hostile wok environment. *Gearhart,* 888 F.Supp. at 824. The court characterized the conduct as "nothing more than some evidence of flirting, some casual touching, and sexual innuendos or jokes." *Id.* at 825 (citation omitted).

The conduct presently complained of is less offensive than the two previous examples of conduct not actionable as a matter of law. This conduct was by no means frequent, severe or threatening, nor did it unreasonably interfere with Plaintiff's work performance. *See Long,* 88 F.3d at 309. Additionally, after Plaintiff told McLochlin that his comments offended her, he never made another comment of that nature. The fact that

no further jokes or hugs occurred should be considered prompt remedial action. *See id.*

■ Conduct does not need to be sexual in nature to constitute sexual harassment. It only needs to be unlawfully based on gender. *See, e.g., Kopp v. Samaritan Health Sys., Inc.,* 13 F.3d 264, 269 (8th Cir.1993); *Andrews v. City of Philadelphia,* 895 F.2d 1469, 1485 (3rd Cir.1990); *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1415 (10th Cir.1987). This means that Plaintiff could allege that all of McLochlin's "retaliation" was gender-based and constitutes sexual harassment. However, it is important to note that Plaintiff did not attempt to establish any connection between her gender and the "retaliation." Assuming that the entirety of McLochlin's actions are included in Plaintiff's claim, Plaintiff still fails to meet her evidentiary burden. The retaliatory conduct consists of McLochlin (1) failing to promptly sign trade corrections, (2) reprimanding Plaintiff for a trade ticket error, (3) failing to address Plaintiff by name, while addressing others in her presence, on at least one occasion, (4) spreading several work related rumors about the Plaintiff, and (5) shouting at Plaintiff during their October 28 meeting.

The conduct complained of in items one and two appears to be completely normal for a work environment. Plaintiff makes no attempt to explain how the treatment she received differed from the experience of any other employee. Similarly, as to item three, Plaintiff fails to provide any specific information as to how McLochlin's conduct was unusual or inappropriate. McLochlin's failure to address Plaintiff by name may be impolite, but it is not offensive enough to be considered harassment. Item four is not substantiated by sufficient facts to be the basis of a sexual harassment suit. The rumors in Plaintiff's complaint are mere work-place gossip. McLochlin is accused of telling two employees that the Plaintiff said, that such employees may resign. McLochlin also told one employee that he heard that the Plaintiff was filing a harassment complaint against the employee. Those statements are not inherently offensive or abusive, nor does Plaintiff allege that those rumors affected her relationships with the co-workers involved.

Moreover, Plaintiff's evidence is based on inadmissable hearsay and should not be considered in deciding this motion. See Fed. R.Evid. 801(c); Fed.R.Civ.P. 56(e). Plaintiff has had over two years from the termination of her employment to obtain statements from witnesses to the alleged rumors. However, she merely asserts that three people told her, that McLochlin falsely accused Plaintiff of making several work related comments. (Plaintiff Aff. ¶¶ 21, 22.) Plaintiff cannot defeat a motion for summary judgment by relying on the bald statement in her affidavit. She is required to come forward with specific facts to support her claim. Fed.R.Civ.P. 56(e). In regard to item five, Plaintiff claims that McLochlin screamed at her during the October 28th meeting. A reasonable person could find this conduct hostile or abusive. However, as with all of the above mentioned conduct, Plaintiff fails to bring forth any evidence to show a relation to gender. Although the exchange in question concerned the harassment complaint that Plaintiff lodged with the human resources department, a supervisor cannot be considered to be taking gender-based action simply because he is discussing a gender-based complaint. Discussing employee complaints is a common job function for any supervisor. Had McLochlin said anything during the conversation to indicate that the alleged shouting was due to a gender bias, that incident could be actionable. For example, "[i]t is one thing to call a woman 'worthless,' and another to call her a 'worthless broad'" *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1463 (9th Cir.1994). The latter comment is gender-based and can support a claim of hostile work environment. *Id.* Plaintiff does not allege that any such language was used.

Based on the foregoing, the Court concludes that Plaintiff has not alleged a genuine issue of material fact with respect to the hostile work environment claim.

*2. Retaliation*

An employer commits an unlawful employment practice if he retaliates or discriminates against a person who opposes a discriminatory practice. Tex. Labor Code § 21.055. A

plaintiff establishes a prima facie case for retaliation by proving that (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) a causal link exists between the protected activity and the adverse employment action. *Long*, 88 F.3d at 304. An employee engages in a protected activity by opposing an unlawful and discriminatory employment practice. *Id.* This means that if an employee is being harassed, she has a right to complain to the proper authorities. An employee need only have a reasonable belief that the practices she opposed were unlawful. *Id.* The term "adverse employment action" is interpreted to mean only "ultimate employment decisions," such as hiring, granting leave, discharging or promoting. *Dollis v. Rubin*, 77 F.3d 777, 781–82 (5th Cir.1995).

 Plaintiff's complaint to McLochlin in mid-October was a protected activity. It was reasonable for Plaintiff to believe that the conduct she challenged, McLochlin's jokes and unwanted hugs, was unlawful. The Court accepts, for summary judgment purposes, that Plaintiff's complaint to the human resources department on October 27th was also a protected activity. As to the second element of the prima facie case, the Court finds a fact issue with regard to the adverse employment action. McLochlin's supposedly retaliatory conduct involving the trade corrections and the reprimand do not fall within the scope of an adverse employment action. *See Larry v. North Miss. Medical Ctr.*, 940 F.Supp. 960, 964–65 (N.D.Miss. 1996) (holding that a written warning cannot constitute an "adverse employment action" because it did not result in a demotion or a lowering of wages). If Plaintiff was fired, that would certainly constitute an ultimate employment decision and therefore an adverse employment action. However, if Plaintiff left on her own volition, her departure does not reflect any action by the company.[1]

The termination of Plaintiff's employment was preceded by a series of conversations with Kidder human resources representa-

tives. Plaintiff alleges that at some point during these discussions Kidder proposed that Plaintiff resign her position and waive any legal claims against Kidder in exchange for a severance package. There is a dispute as to which party initiated the separation talks. If Kidder solicited Plaintiff's resignation, that adds weight to Plaintiff's retaliation claim. However, if Plaintiff first suggested that she resign, Kidder would not be acting unlawfully by complying with Plaintiff's wishes. The parties offer conflicting evidence on this point and thus the issue cannot be resolved on summary judgment.

Furthermore, the evidence does not conclusively demonstrate that Plaintiff resigned during her phone conversation with Carday of November 4, 1994. Plaintiff states several times in her deposition that she felt it necessary to leave Kidder to protect her health. Her statements include, "I can't stay here, my health is too bad," and "I honestly believed it was my health or else, so I had to leave." (Plaintiff Depo. at 360, 142.) Additionally, two different drafts of proposed separation agreements, one produced by Kidder and one produced and signed by Plaintiff, each refer to Plaintiff's resignation on November 4, 1994. November 4th was the last day that Plaintiff ever reported for work and Plaintiff testifies that she did not plan on returning until the harassment situation was resolved. By November 23rd, Plaintiff had moved to Minnesota. The above facts are countered by evidence that indicates that Plaintiff's employment was involuntarily terminated. Although Plaintiff did not report to work after Friday, November 4th, she called in sick on the 7th, 8th, 9th and 10th. This behavior shows that Plaintiff believed her employment was still effective after the November 4th discussion with Carday. Additionally, Plaintiff did not sign the Separation Agreement and Release prepared by Kidder. Plaintiff instead offered her own version of a release agreement with an attached letter, asserting that Plaintiff "was under the impression termination was only in effect providing [she] signed the release." (Letter

---

1. A plaintiff can claim that a voluntary resignation was actually a constructive discharge and therefore amounts to an adverse employment action. *Larry v. North Miss. Medical Ctr.*, 940

F.Supp. 960, 965 (N.D.Miss.1996). Because Plaintiff does not make this allegation, the court will not address it.

from Plaintiff to Carday of 11/08/94, attached as Exhibit 3 to plaintiff Depo.)

Plaintiff also testifies that she did not intend to resign. Plaintiff claims that the November 4th discussion was only a step in a negotiation process that produced no final decisions, and Kidder used that discussion to disguise her dismissal as a resignation. Kidder argues that Plaintiff's affidavit testimony concerning her intention to continue working, directly contradicts her deposition testimony and should therefore be disregarded. It is well settled that a motion for summary judgment cannot be defeated by an affidavit that impeaches, without explanation, the prior sworn testimony of the affiant. *S.W.S. Erectors, Inc. v. Infax, Inc.,* 72 F.3d 489, 495 (5th Cir.1996). While Plaintiff, in her deposition testimony, did express an interest in leaving Kidder, she never made a definite statement of an intention to resign. Plaintiff's deposition testimony from pages 390 to 394 indicates her dissatisfaction with the work environment, but also contains the firm statements that, "I did not resign," and "I had every intention of returning." (Paintiff Depo. at 392, 394.) Plaintiff's deposition may not be entirely clear, but it is not substantially different from her affidavit testimony. Because the affidavit supplements Plaintiff's earlier expression of her intentions, it will be considered. Based upon the evidence presented, the Court is unable to conclude that Plaintiff in fact resigned and was therefore not subjected to an adverse employment action. Whether Plaintiff was fired or resigned is a factual dispute that cannot be resolved at the summary judgment stage.

■ In addition, there is a material factual dispute as to the existence of a causal link between Plaintiff's protected actions and the discharge. McLochlin is the individual identified in Plaintiff's harassment complaints. He is supposedly the one with the retaliatory motive. However, McLochlin took no part in the decision to discharge Plaintiff. That decision was made entirely by Pat Carday, Vice President of Human Resources. Carday's first contact with Plaintiff was by telephone on October 27th. Eight days later, on November 4th, Plaintiff's employment was terminated. Carday claims that she and Plaintiff negotiated the terms of Plaintiff's resignation during their November 4th phone conversation. Plaintiff does not allege that Carday was in any way influenced by McLochlin. *See Long,* 88 F.3d at 306 (stating that if the decision maker reaches his conclusion independently of those who may have retaliatory motives, the causal link is broken). However, the Court must consider the possibility that Carday herself had a retaliatory motive for discharging Plaintiff. Kidder may have demonstrated a low tolerance for dealing with this complaining employee, and preferred to resolve the situation by terminating the employment relationship as opposed to finding an internal remedy. Because there is a fact question as to a causal link between Plaintiff's protected employment activity and her alleged termination, Kidder now has the burden of articulating a legitimate non-retaliatory reason for terminating Plaintiff. *Id.* at 308. Kidder claims that any involuntary termination is due to Kidder's "good faith" yet mistaken belief that Plaintiff intended to resign. (Defendant's Brief at 13.) At this point, the credibility of Plaintiff and Carday are key in resolving the issue. Each side presents a different version of what was decided during the November 4th discussion and only the trier of fact may properly resolve this dispute.

### 3. Intentional Infliction of Emotional Distress

■ Plaintiff's claim for this tort is based upon McLochlin's alleged rumor campaign and the October 28th, meeting where McLochlin is accused of shouting at Plaintiff. (Plaintiff's Brief at 8.) To recover on a claim for intentional infliction of emotional distress, a plaintiff must establish (1) the defendant acted recklessly or intentionally, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the emotional distress suffered was severe. *Twyman v. Twyman,* 855 S.W.2d 619, 621–22 (Tex.1993). Conduct gives rise to a cause of action only when it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to

be regarded as atrocious, and utterly intolerable in a civilized community." *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). The Fifth Circuit has recognized that, in the employment context, the broad range of conduct labeled as "mere employment disputes" will not support a claim for intentional infliction of emotional distress. *MacArthur v. University of Tex. Health Ctr.,* 45 F.3d 890, 898 (5th Cir.1995). Ordinary employment disputes do not rise to the level of "extreme and outrageous" behavior because, "[i]n order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline [its] employees." *Id.*

■ As stated above, the rumor allegation is not supported by sufficient evidence to be afforded significant weight. The shouting incident is therefore the only conduct at issue. Although shouting in the workplace is generally not condoned, this incident is not extreme and outrageous behavior of a tortious level. McLochlin was upset that Plaintiff filed what he believed to be an unfounded harassment complaint against him. There is no showing that McLochlin's loud tone was intended to frighten Plaintiff. At worst, McLochlin yelled that Plaintiff was "selfish." (Plaintiff Aff. ¶ 18.) It is not alleged that McLochlin said anything of a personal, vulgar or humiliating nature. Plaintiff contends that McLochlin should have been aware that shouting at Plaintiff could be particularly distressing to her, due to her heart condition. However, in light of Plaintiff's testimony that running down 39 flights of stairs (which she did after the shouting incident) is not a burden on her heart, there is no reason why McLochlin should have been extra sensitive to her condition. When compared with conduct found to be non-tortious as a matter of law in other cases, McLochlin's shouting is clearly not actionable. In *Sebesta v. Kent Electronics Corp.,* 886 S.W.2d 459 (Tex. App.—Houston [1st Dist.] 1994, writ denied), an employer arranged an embarrassing "exit parade" for the plaintiff upon her termination, the supervisor yelled at plaintiff for serving on jury duty and misled plaintiff about her ability to apply her vacation days toward the jury duty absences. *Id.* at 463. In *MacArthur v. University of Texas Health*

*Center,* 45 F.3d 890 (5th Cir.1995), the plaintiff was subjected to "unfounded accusations" that she had sabotaged another scientist's project, was threatened with being charged "with scientific misconduct" and was reprimanded in a rude and intemperate manner. *Id.* at 899. McLochlin's alleged conduct was far less offensive than that of the cases above and thus, will not support a claim for intentional infliction of emotional distress.

■ Furthermore, Plaintiff did not suffer distress so severe that "no reasonable [person] could be expected to endure it." *McKethan v. Texas Farm Bureau,* 996 F.2d 734, 742 (5th Cir.1993), *cert. denied,* 510 U.S. 1046, 114 S.Ct. 694, 126 L.Ed.2d 661 (1994). Although Plaintiff cried as a result of McLochlin's words, crying is not by itself a severe response. Plaintiff did not experience anything other than "mere worry, anxiety, vexation, embarrassment or anger." *Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). Plaintiff attempts to emphasize the severity of her distress by focusing on the fact that she fainted approximately one half hour after she left McLochlin's office. This fainting does not indicate the distress caused by the shouting because Plaintiff has a long history of fainting episodes. In any event, Plaintiff's physical and emotional reaction to McLochlin's conduct did not last beyond the day in question. McLochlin's conduct was not outrageous and Plaintiff's distress was not severe. Plaintiff fails to establish a genuine issue of material fact in regard to two necessary elements of this claim.

## C. Defendant's Motion to Strike Evidence

The Court finds that Plaintiff's testimony regarding McLochlin's rumor campaign constitutes inadmissible hearsay. However, even if the Plaintiff's testimony was considered by the Court and construed in her favor, the testimony does not contain facts sufficient to defeat a motion for summary judgment. Plaintiff's testimony as to statements made by Kathy Davis was examined only to the extent that the statements may have affected Plaintiff's state of mind, and were not considered as proof of the underly-

ing claims. Additional items of evidence challenged by Defendant were of no probative value in reaching the decision. Because this challenged evidence does not affect the Court's decision making on the dispositive relief requested, Defendant's motion to strike Plaintiff's summary judgment evidence is MOOT.

### III. CONCLUSION

After review of the arguments, authorities, and record of this matter, IT IS ORDERED that the defendant Kidder, Peabody & Co., Inc.'s motion for summary judgment is GRANTED as to the claims of intentioanal infliction of emotional distress and hostile work environment, and DENIED for the claim of retaliation.

**SO ORDERED.**