**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**
_____

**No. 00-20552**
_____

**KATHY FENTROY,**
**Plaintiff - Appellee - Cross Appellant,**

**versus**

**DILLARD TEXAS OPERATING LIMITED PARTNERSHIP; ET AL**
**Defendants**

**DILLARD TEXAS OPERATING LIMITED PARTNERSHIP**
**Defendant - Appellant - Cross Appellee.**
_____

**No. 00-20990**
_____

**KATHY FENTROY,**
**Plaintiff - Appellee,**

**versus**

**DILLARD TEXAS OPERATING LIMITED PARTNERSHIP; ET AL**
**Defendants,**

**DILLARD TEXAS OPERATING LIMITED PARTNERSHIP**
**Defendant - Appellant.**

_____
**Appeals from the United States District Court for the**
**Southern District of Texas, Houston**
_____

November 8, 2001

Before DAVIS and JONES, Circuit Judges, and PRADO,[1] District

---

[1] District Judge of the Western District of Texas, sitting
by designation.

1

Judge.

PER CURIAM:[2]

This appeal arises from Kathy Fentroy's lawsuit against her former employer, Dillard's Texas Operating Limited Partnership (Dillard's), and Fentroy's former supervisor, Harry Williams. Fentroy initially sued Dillard's and Williams for employment discrimination based on race and disability, intentional infliction of emotional distress, and failure to comply with the notice provisions of the Family and Medical Leave Act. The district court granted summary judgment on most of these claims, and for Williams, but determined that Fentroy had raised issues of material fact regarding her Title VII claim. Fentroy's complaint described conduct amounting to disparate treatment on the basis of race, and alleged that the conduct subjected her to a hostile work environment. Although Fentroy's complaint was somewhat confusing, the district court characterized Fentroy's Title VII claim as a hostile work environment claim. The case proceeded to trial against Dillard's on that theory—*i.e.*, hostile work environment.

The jury found that Dillard's had subjected Fentroy to a hostile work environment on account of her race, and awarded Fentroy $24,000.00 in compensatory damages. The jury also found

---

[2]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

that Dillard's acted with malice or reckless indifference to Fentroy's federally-protected rights, and awarded Fentroy $72,000.00 in punitive damages. After entering a judgment consistent with the jury's verdict, the district court acted on Dillard's motion for judgment as a matter of law, and set aside the punitive damages award. Dillard's then filed a notice of appeal to challenge the jury's liability finding and the compensatory damages award.[3] Fentroy also filed a notice of appeal to challenge the setting-aside of the punitive damages award.[4] This opinion considers both appeals.

### Dillard's Appeal

Dillard's presents eight issues for review. This court, however, need only consider one issue to resolve Dillard's appeal–that is, whether the district court erred in failing to grant Dillard's motion for judgment as a matter of law as to the sufficiency of the evidence to support the jury's finding of liability for a hostile work environment.

This court reviews the district court's denial of a motion for judgment as a matter of law under the same standard that the district court uses in considering the motion at trial. *See Conkling v. Turner*, 18 F.3d 1285, 1300 (5th Cir. 1994). Judgment as a matter of law is proper if after a party has been fully

---

[3]Appeal No. 00-20552 applies to Dillard's challenge.

[4]Appeal No. 00-20990 applies to Fentroy's challenge.

heard by the jury on a given issue, "there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue."  FED. R. CIV. P. 50(a).  In evaluating the motion, the district court must view the entire trial record in the light most favorable to the non-movant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts to the jury.  *See Conkling*, 18 F.3d at 1300.  "The 'decision to grant a directed verdict . . . is not a matter of discretion, but a conclusion of law based upon a finding that there is insufficient evidence to create a fact question for the jury.'" *Id*. at 300-01 (citations omitted).  Consequently, this court must determine whether sufficient evidence was presented during trial to permit a reasonable jury to find for Fentroy on the hostile work environment question.

To prove that she was subjected to a racially hostile work environment, Fentroy was required to prove:(1) that she belongs to a protected class, (2) that she was subject to unwelcome racial harassment, (3) that the harassment was based on race, (4) that the harassment affected a "term, condition, or privilege" of employment, and (5) that Dillard's knew or should have known of the harassment and failed to take prompt remedial action.  *See Shepherd v. Comptroller of Pub. Accounts of State of Tex.*,168

4

F.3d 871, 873 (5th Cir. 1999).  In addition, Fentroy had to show: (1) racially discriminatory intimidation, ridicule and insults, which were (2) sufficiently severe or pervasive that they (3) altered the conditions of employment and (4) created an abusive working environment.  *See DeAngelis v. El Paso Mun. Police Officers Ass'n*, 51 F.3d 591, 594 (5th Cir. 1995).

> Whether an environment is "hostile" or "abusive" is determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance.  To be actionable, the challenged conduct must be both objectively offensive, meaning that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that the victim perceived it to be so.

*Shepherd*, 168 F.3d at 874.  As a result, this court must review the evidence in the light most favorable to Fentroy to determine whether Fentroy met her burden.

Fentroy based her employment discrimination claim upon a chronology of incidents in which she contends she was treated differently from her white co-workers.  These incidents allegedly began in 1989 and continued until the end of Fentroy's employment in 1996.  Although many of these incidents occurred well outside the 300-days limitations period that applies to an employment discrimination case, the incidents simply do not support a hostile work environment claim even when viewed in the light most favorable to Fentroy.

5

For example, Fentroy testified that she served as an Area Sales Manager (ASM) for Dillard's Woodlands store. She described how she played an instrumental role in opening the new store in September 1994. Fentroy explained that in January 1995, the store conducted an inventory and that her department had a big shortage. Fentroy testified that she was counseled regarding the shortage, and that she felt that she was given an ultimatum to turn the inventory around or that she would be terminated or moved to another position. Although Fentroy stated that other ASMs were counseled for shortages in their departments, she asserted that Williams pressured her about improving the inventory in her department. Fentroy also testified that she was disciplined more harshly than other ASMs for inventory shortages. She asserted that even though she had a good inventory the following July, store managers criticized her even more harshly than before. Fentroy opined that her treatment was due to her race—that is, because she is black.

Fentroy also explained that after being on medical leave for over twelve weeks, she was demoted upon her return and reassigned as a sales associate. She complained that white associates and managers who returned from medical leave were not demoted. To support this position, Fentroy used company documents she obtained from Dillard's during discovery to demonstrate that white employees were permitted to return from medical leave and

6

return to work in the same position they held prior to medical leave.

Fentroy also asserted that lesser qualified white employees were promoted and that she was not promoted because she is black. Fentroy used discovery documents to demonstrate that white employees were promoted and received bigger pay raises than she did. Fentroy attributed this treatment to her race.

Denine Ingram, a black individual who worked at the store during Fentroy's employment, testified that the store's operations manager told her to hire employees to reflect the store's community. Ingram, an ASM at the time, stated that the store's community was mostly Caucasian, and that the operations manager had refused to hire a qualified black applicant that she recommended.

Sharon Green, a sales associate in Fentroy's department, testified that the January 1995 inventory showed almost a half million dollars in shortage. Green speculated that the construction workers that were still working in the store took much of the merchandise reflected by the shortage.

Felicia Tillery, a former employee, testified that the majority of black applicants she recommended for third interviews were not selected for employment. Tillery explained that she arrived at the Woodlands store a few months after it opened, and observed that Fentroy was more scrutinized than other ASMs. She

7

described an incident in which she contended Williams told her that Fentroy was unfit to be an ASM, and that Williams told her to watch Fentroy after she returned from medical leave. Tillery also stated that the operations manager told her to place applications from black applicants aside, and that the store must hire sales associates that fit the community. Tillery also stated that Williams told her that he did not what any more black employees because it made the store look dingy, and that he expressed unhappiness with Fentroy when he walked through the store prior to an inventory.

The testimony described above is characterized by complaints of disparate treatment—that is, that Fentroy was treated less favorably than other employees because she is black. The essence of a disparate treatment claim is different treatment. Disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race." *Teamsters v. United States*, 431 U.S. 324, 335 n.15. When viewed in the light most favorable to Fentroy, Fentroy showed that she received smaller raises than white employees, that she was not permitted to return to her old position when she returned from medical leave even though white employees were permitted to return to their positions, and that white employees were promoted and that she was not. In other words, Fentroy presented evidence that Dillard's treated her differently than white employees. Although

8

this evidence may support a jury verdict for a disparate-treatment claim, the jury was not asked whether Fentroy was subjected to disparate treatment because of her race. Instead, the jury was asked whether Dillard's "subjected Ms. Fentroy to a hostile or abusive work environment on account of her race?" The evidence discussed above does not support this question.

Notably, no evidence exists that Fentroy was subjected to racially discriminatory intimidation, ridicule or insult. No evidence indicates that Fentroy was the subject of racial harassment. Even Tillery, who was arguably the most damaging witness for Fentroy, testified that she was not aware of anyone making any remarks about Fentroy's race, and that she did not know of any facts that suggested that Williams wanted Fentroy gone because she was African American. Without evidence of racial harassment, there is no evidence to support the jury's verdict. As a result, the district court erred by denying Dillard's motion for judgment as a matter of law.

### Fentroy's Appeal

Fentroy appealed the district court's judgment setting aside the jury's punitive damages award. This court, however, has determined that no evidence exists to support the jury's liability finding. Without a finding of liability, no basis exists for a damages award. As a result, the district court's amended judgment awarding compensatory damages must be reversed.

9

**Conclusion**

Having determined that no evidence exists to support the jury's liability finding, and that the district court erred by denying Dillard's motion for judgment as a matter of law, this court must reverse the district court's judgment and render judgment as a matter of law in favor of Dillard's. *See Krystek v. Univ. of S. Miss.*, 164 F.3d 251, 258 (5th Cir. 1999). Although arguably Fentroy may have been entitled to a new trial for a disparate impact claim, Fentroy never challenged the district court's summary judgment order. As a result, she waived the opportunity to re-try her case on a disparate impact theory. Accordingly, this court shall REVERSE the district court's amended judgment, signed on May 23, 2000, and RENDER judgment for Dillard's.