James Doyle **LUPO**

v.

**WYETH–AYERST LABORATORIES and American Home Products Corporation.**

**No. 1:96 CV 525 (TH).**

United States District Court, E.D. Texas, Beaumont Division.

May 21, 1997.

John R. Craddock, Houston, TX, for Plaintiff.

M. Carter Crow & Lawrence H. Clore, Houston, TX, for Defendants.

### MEMORANDUM OPINION

HEARTFIELD, District Judge.

1. Plaintiff, James Doyle Lupo, sues defendants, Wyeth–Ayerst Laboratories (Wyeth) and American Home Products Corporation (American), for violation of Section 21.051 of the Texas Labor Code and for intentional infliction of emotional distress.

2. The court now grants defendants' motion for summary judgment on both of Lupo's claims [35].[1]

#### Summary Judgment Standard

3. "Federal Rule of Civil Procedure 56(c) provides that a grant of summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Pollock v. Federal Deposit Ins. Corp.*, 17 F.3d 798, 803 (5th Cir.1994). "The mere existence of a factual dispute does not by itself preclude the granting of summary judgment. '[T]he requirement is that there

---

1. In reaching this ruling, the court has considered Defendant's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment [41] and Doyle Lupo's Rejoinder to Defendants' Reply to Response to Motion for Summary Judgment [44], even though it never has authorized the filing of either of these documents. *See* E.D.Tex.R. CV–7 (only discussing motions and responses); E.D.Tex. CJRA Plan 7 (same).

be no *genuine* issue of *material* fact.' " *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir.1987). "The substantive law ... identif[ies] which facts are material." *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *see Texas Manufactured Hous. Ass'n v. City of Nederland*, 101 F.3d 1095, 1099 (5th Cir.1996) ("A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."), *petition for cert. filed*, —— U.S.L.W. —— (U.S. Apr. 25, 1997) (No. 96–1707). "There is no genuine issue of material fact if the evidence is such that, drawing all reasonable inferences in favor of the non-movant, ... a reasonable jury could not return a verdict in his [or her] favor." [2] *Atkinson v. Denton Pub. Co.*, 84 F.3d 144, 148 (5th Cir.1996); *see Texas Manufactured Hous. Ass'n*, 101 F.3d at 1099 ("An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmovant party.").

5. "In the 'run-of-the-mill' civil case, the defendant moves for summary judgment on the ground that the evidence in the record demonstrates that it is entitled to a judgment as a matter of law—that should the case proceed to trial, the plaintiff will not sustain its burden of proof and the court will necessarily enter a verdict in its favor." *International Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263–64 (5th Cir.1991), *cert. denied*, 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). To show that the evidence mandates summary judgment in its favor, the defendant either "affirmatively offer[s] evidence which undermines one of the essential elements of the plaintiff's case; or, ... simply demonstrate[s] that the evidence in the record falls short of establishing an essential element of the plaintiff's case," [3] *id.* at 1264; *see Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir.) (party moving for summary judgment carries its burden "by informing the court of the basis for its motion, and by identifying portions of the record which highlight the absence of genuine factual issues"), *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992). When the defendant makes a properly supported motion for summary judgment, the plaintiff "must bring forward ... 'significant probative evidence' " showing the existence of a genuine issue of material fact.[4] *Gutterman*, 896 F.2d at 118; *accord Texas Manufactured Hous. Ass'n*, 101 F.3d at 1099. It "can satisfy [this] ... burden by tendering depositions, affidavits or other competent evidence," *Topalian*, 954 F.2d at 1132, or "by referring to evidentiary documents already in the record," *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir.1990), *cert. denied*, 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed.2d 131 (1993).[5] *Accord International Shortstop*, 939 F.2d at 1263–64. This showing, however, "must [raise] ... more than a metaphysical doubt about the material facts," *Washington v. Armstrong World Indus., Inc.*, 839 F.2d 1121, 1123 (5th Cir.1988), and must constitute more than a "mere scintilla of evidence," *Spiller v. Ella Smithers Geriatric Ctr.*, 919 F.2d 339, 343 (5th Cir.1990). Moreover, the plaintiff cannot elude the defendant's properly supported summary judgment motion by presenting "conclusory allegations, improbable inferences, and unsupported speculation," *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1439 (5th Cir.1993); *accord Grimes v. Texas Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 139 (5th Cir.1996) ("Needless to say, unsubstantiated

---

**2.** This principle " 'mirrors' the standard for a [judgment as a matter of law] under Fed.R.Civ.P. 50(a)." *St. Amant*, 806 F.2d at 1297; *accord Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 n. 4 (5th Cir.1996) (en banc); *see infra* note 4.

**3.** "Under [the] ... latter option, the defendant need not produce evidence of its own because it is the plaintiff that will bear the burden of proof at trial." *International Shortstop*, 939 F.2d at 1264.

**4.** This demand "may be equated with the 'substantial evidence' standard used to determine whether a [judgment as a matter of law] is appropriate." *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir.1990); *see Transco Leasing Corp. v. United States*, 896 F.2d 1435, 1444 (5th Cir.1990).

**5.** "[T]he plaintiff need not offer all of the evidence tending to support its case, only enough evidence from which a jury might return a verdict in [its] favor." *International Shortstop*, 939 F.2d at 1264 (internal quotations omitted).

assertions are not competent summary judgment evidence."); *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir.1985) ("In fact, unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."), or by "claim[ing] that further discovery or a trial might reveal facts [of] which [it] ... is currently unaware," *Armstrong World Indus.*, 839 F.2d at 1123. When the plaintiff fails to meet its evidentiary burden, entry of summary judgment for the movant results. *Topalian*, 954 F.2d at 1131; *Fields v. City of South Houston, Tex.*, 922 F.2d 1183, 1187 (5th Cir.1991); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir.1986).

### *Undisputed Facts*

#### *Reduction-in-Force*

6. American includes a pharmaceutical products division, Wyeth. Pl.'s Resp. to Defs.' Mot. for Summ.J. [hereinafter Resp.] (Ex. A (Permanent Reduction-in-Force Notice [hereinafter Notice])); *see* Defs.' Mot. for Summ.J. [hereinafter Mot.] (Defs.' Ex. B (Aff. of Vincent Minora ¶¶ 2, 3 [hereinafter Minora Aff.])) (Defs.' Ex. E (Videotaped Dep. of Patricia Redd at 40 [hereinafter Redd Dep.])).

7. In October, 1993, Wyeth announced its intention to undertake a nationwide internal review, known as the Organizational Effectiveness Program (OEP), to determine how to reform its operations to increase competitiveness. Doyle Lupo's Rejoinder to Def.'s Reply to Resp. to Mot. for Summ.J. [hereinafter Rejoinder] (Ex. 20 (Letter from Essner

---

**6.** The record nowhere discloses exactly when the decision to cut Wyeth's sales force occurred. *But cf.* Essner Letter (stating that Wyeth expected the OEP "to be completed by mid–1994").

**7.** Wyeth apparently weighed each of these factors equally. *See* Minora Aff. ¶ 3.

**8.** Wyeth's performance appraisal system used the following scores to rate sales representative achievement: 5 (exceptional), 4 (exceeds expectations), 3 (at expectations), 2 (below expectations) and 1 (unsatisfactory). Using the same five-point scale for each constituent factor, the overall performance appraisal rating score was calculated using the following equation:

of 10/29/93 [hereinafter Essner Letter]); *see* Minora Aff. ¶ 3; Resp. (Pl.'s Ex. H (list of OEP's goals)). It hired McKinsey & Company (McKinsey), a management consulting firm, to assist with this evaluation. Minora Aff. ¶ 2; Resp. (Ex. K (American's authorization of Wyeth's retention of McKinsey to conduct the OEP) (McKinsey's contract with Wyeth to complete the OEP)).

8. In November, 1994, American acquired American Cyanimid Corporation (American Cyanimid), which controlled Lederle Laboratories (Lederle), a pharmaceutical products distributor. Minora Aff. ¶ 2. Subsequent to this transaction, Lederle was integrated into Wyeth. Minora Aff. ¶ 3. *See generally* Resp. (Ex. K (list of American Cyanimid's sales personnel)).

9. As part of the OEP, McKinsey and Wyeth concluded that a permanent reduction of Wyeth's sales force was necessary.[6] Minora Aff. ¶ 3; *see* Minora Aff. ¶ 11. Wyeth's absorption of Lederle apparently contributed to their reaching that determination. *See* Minora Aff. ¶ 3; Resp. (Ex. F (Letter from Mattley of 1/17/95 [hereinafter Mattley Letter])).

10. Wyeth decided to eliminate 376 sale representative positions permanently. Minora Aff. ¶ 4; *see* Essner Letter. To effectuate this reduction-in-force (RIF), it targeted for termination those sales representatives with poor performance records. These persons were identified by examining five pieces of information for each sales representative:[7] 1993 overall performance appraisal rating score (1993 rating), 1994 overall performance appraisal rating score (1994 rating),[8] dollar

---

[(Sales Productivity Score) × (0.60)] ÷ [(Organizational Skills Score) × (0.10)] ÷ [(Sales Skills Score) × (0.10)] ÷ [(Product Knowledge Score) × (0.10)] ÷ [(Compliance with Administrative Rules) × (0.10)]

Mot. (Defs.' Ex. A attach. (Dep.Ex. 3 (Lupo's 1993 Performance Appraisal at 2 [hereinafter 1993 Performance Appraisal]); Resp. (Ex. 3 (Lupo's 1994 Performance Appraisal at 2 [hereinafter 1994 Performance Appraisal])); *see also* Mot. (Defs.' Ex. A (Dep. of James Doyle Lupo at 105–06 [hereinafter Lupo Dep.])). The sales productivity score, the most important factor in the performance appraisal rating calculus, *see supra*, derived from comparing prior year sales with current year sales, *see* 1994 Performance

amount of first 1993 salary bonus, dollar amount of second 1993 salary bonus and dollar amount of first 1994 salary bonus.[9] 1993 Performance Appraisal at 3; 1994 Performance Appraisal at 3. If 3 of these 5 numbers for a particular sales representative were "low," then he or she was designated for discharge.[10] Minora Aff. ¶¶ 4–7. This process yielded 268 names. Minora Aff. ¶ 6; see Resp. (Ex. K (computer printout of the 268 sales representatives [hereinafter Computer Printout])). Because that result fell 108 short of Wyeth's goal of 376, 6 sales representatives in disciplinary programs and 102 sales representatives with short tenure also were selected for release. Minora Aff. ¶ 8. See generally Resp. (Ex. J [hereinafter RIF List] (list of 376 sales representatives subject to the RIF)).

11. Neither regional sales managers nor district sales managers were involved in determining which sales representatives to terminate to accomplish the sales force RIF. Minora Aff. ¶ 10; Redd Dep. at 105–06; see Mot. (Defs.' Ex. F (Videotaped Oral Dep. of William Bartek at 45–46, 94 [hereinafter Bartek Dep.])); cf. Redd Dep. at 53 (stating a lack of knowledge about why certain data provided the basis for evaluations of sales representative performance).

12. Sales representatives losing their jobs as a result of the RIF received notice of their fate on January 17, 1995. Notice; Lupo Aff. at 1; Mattley Letter. Their active employment with Wyeth ended four days later. Mattley Letter. On March 21, 1995, the relationship between Wyeth and those individuals ceased completely. Notice; Resp.

(Ex. G (Lupo's Unemployment Insurance Claim Form)).

13. Following the RIF, the average age for Wyeth's sales force increased from 38.7 years to 41.98 years. Resp. (Ex. I [hereinafter Charts] (Chart: Average Age—Before & After)).

### Lupo

14. Lupo began working for Wyeth as a sales representative in 1984. See Lupo Aff. at 1, 7; Resp. (Ex. C (Letter from Redd to Lupo of 1/5/94)). He was assigned a sales territory that included Beaumont, Texas. See Bartek Dep. at 57; cf. Lupo De. at 8.

15. In 1993, Patti Redd became manager of Wyeth's regional sales office in Dallas, Texas, which oversaw the sales district that included Lupo's sales territory. Lupo Dep. at 54; see Notice.

16. Lupo's poor sales record during the first part of 1993 prompted Redd to visit him in the field on July 21 of that year.[11] See Redd Correspondence at 1. Based upon this encounter, she concluded that Lupo needed to improve certain business practices to bolster sales. See Redd Dep. at 26, 88–89; Redd Correspondence at 1–2; Bartek Dep. at 39 (recalling Redd's assessment of Lupo's work). In this regard, she apprised Bill Bartek, Lupo's district manager, of her belief that a Performance Improvement Plan (PIP) was needed to spur Lupo to change.[12] Redd Correspondence at 3; Lupo Aff. at 3, 6. Bartek, however, chose to secure a promise from Lupo to take some actions aimed at

---

Appraisal attach. A; 1993 Performance Appraisal attach. A. In 1993 and 1994, district sales managers completed performance appraisals for sales representatives under their supervision. See 1994 Performance Appraisal at 1; 1993 Performance Appraisal at 1.

9. Sales productivity apparently determined the size of salary bonuses. See Resp. (Aff. of James Doyle Lupo at 3 [hereinafter Lupo Aff.]).

10. Wyeth identified a "low" overall performance appraisal rating as a score of 1 or 2. Minora Aff. ¶¶ 5–6. The record fails to disclose what it defined as a "low" salary bonus. See, e.g., Minora Aff. ¶¶ 4–8.

11. Redd was particularly worried about Lupo's low sales for three products, premarin, Iodine

and maxaquin. See Redd Dep. attach. (Internal Correspondence from Redd to Bartek of 7/22/93, at 1 [hereinafter Redd Correspondence])); see also Redd Dep. at 89–90. Prior to her visit, she had asked Jill Klock, a sales analyst in Wyeth's Sales & Marketing Department, to determine if repackaging explained the drop in Lupo's premarin sales. Mot. (Defs.' Ex. D (Aff. of Jill Klock attach. (Klock Mem. to Redd of 7/12/93 [hereinafter Klock Mem. II])); Redd Dep. at 54–55. Klock had found no such connection. See Klock Mem. II; Redd Dep. at 55. Redd had sent a copy of Klock's report to Lupo. Lupo Aff. at 7.

12. A PIP was a formal strategy for improving sales productivity. See Redd Correspondence.

addressing Redd's concerns. *See* Bartek Dep. at 39–40; Lupo Aff. at 4.

17. On July 29, 1993, Lupo received an overall performance appraisal rating score of 2 (below expectations) from Bartek.[13] 1993 Performance Appraisal at 1, 3, 4. A score of 1 for sales productivity primarily precipitated this result. *See* 1993 Performance Appraisal at 2. *See generally* Lupo Dep. at 105–06; *supra* note 8.

18. In August, 1993, Lupo asked Bartek why the 1992 sales figure for premarin in his June 1992 Selected Products Report was lower than 1992 premarin sales figure in his June 1993 Selected Products Report.[14] *See* Mot. (Defs.' Ex. D (Aff. of Jill Klock attach. (Mem. of Oct. 13, 1993 from Klock to Bartek); [hereinafter Klock Mem. I])); Lupo Aff. at 3, 8. After receiving a request from Bartek to investigate this matter, Klock determined that two events explained the difference between Lupo's 1992 and 1993 premarin sales figures.[15] First, the 1993 figure's inclusion of premarin sales for a portion of Winnie, Texas, that had been added to Lupo's sales territory as of January, 1993, explained much of the disparity.[16] Klock Aff. ¶ 3; Klock Mem. I. Second, IMS America had reported new sales since the June 1992 Selected Products Report's issuance.[17] Klock Aff. ¶ 3; Klock Mem. I.; *see also* Wojcik Aff. ¶ 5; Redd Dep. at 51–52; Bartek Dep. at 51–52. Bartek reported these findings to Lupo. Bartek Dep. at 51–52; Lupo Aff. at 8; *see also* Bartek Dep. at 81.

19. Although she mentioned it nowhere in her report, Klock also found that Wyeth had made no adjustments to Lupo's 1993 premarin sales data from IMS America. Klock Aff. ¶ 6; *see also* Wojcik Aff. ¶ 6 (review of Lupo's file discloses no adjustments by Wyeth of Lupo's 1993 sales data).

20. Believing that Klock's analysis failed to resolve the divergence between the 1992 and 1993 premarin sales figures, Lupo sent additional letters to Bartek expressing concern about the disparity. Lupo Aff. at 8–9. Bartek failed to address Lupo's inquiries. Lupo Aff. at 9.

21. On September, 19, 1994, Lupo, received an overall performance appraisal rating score of 4 (exceeds expectations) from Bartek.[18] 1994 Performance Appraisal at 1, 3, 4; Lupo Aff. at 10. A score of 5 for sales productivity primarily explained this result. *See* 1994 Performance Appraisal at 2. *See generally* Lupo Dep. at 105–06; *supra* note 8.

22. In late November, 1994, Lupo sent a letter complaining about his premarin sales figures to Jerry Joyner, Redd's superior. Lupo Aff. at 10.

23. Lupo was 1 of the 376 sales representatives terminated in Wyeth's sales force RIF because his 1993 rating, his first 1993 salary bonus, his second 1993 salary bonus and his first 1994 salary bonus all were "low." Mirona Aff. ¶ 7; Computer Printout at 3.

24. Wyeth offered Lupo a general release, which contemplated him waiving of all legal claims based upon his employment in

13. This evaluation covered Lupo's work between January and May, 1993. 1993 Performance Appraisal at 1.

14. A Selected Products Sales Report recorded a sales representative's sales levels for various products for the current and prior years. *See* Mot. (Defs.' Ex. C (Aff. of Jeffrey P. Wojcik ¶ 5 [hereinafter Wojcik Aff.])).

15. Klock's inquiry entailed asking IMS America, which compiled and sold the data appearing Selected Products Sales Reports to Wyeth, to verify the accuracy of Lupo's premarin sales figures and checking Wyeth's records for data errors, as well as for adjustments to IMS America data that Wyeth may have made. Mot. (Def.'s

Ex. D (Aff. of Jill Klock ¶¶ 4–6 [hereinafter Klock Aff.])); Klock Mem. I; Klock Mem. II. *See generally* Wojcik Aff. ¶¶ 2, 6.

16. This action represented a standard practice at Wyeth. Klock Aff. ¶ 3.

17. IMS America constantly sought to locate additional sources of sales information. As a result of this effort, it frequently revised its data to include sales figures acquired from new sources. Wojcik Aff. ¶ 3; *see also* Redd Dep. at 48; Bartek Dep. at 55; Klock Mem. I at 2.

18. This evaluation covered Lupo's work between January and June, 1994. 1994 Performance Appraisal at 1.

return for a financial package.[19] *See* Resp. (Ex. L (copy of General Release) [hereinafter General Release] ).

25. At the time of his discharge from Wyeth, Lupo was fifty-three years old. Lupo Aff. at 1.

26. Following his termination, Lupo's duties were assumed by Traci A. Smith–Puig, a thirty year old sales representative who had worked for Wyeth since 1989. Minora Aff. ¶ 11; Resp. (Ex. D [hereinafter Smith–Puig Records] (Smith–Puig's personal history form and personnel action summary)). Bartek retired before Smith–Puig took over Lupo's responsibilities. Bartek Dep. at 60–62; *see* Bartek Dep. at 109–12, 137.

### Discussion

### Age Discrimination

■ 27. Lupo asserts a disparate treatment claim of age discrimination under Section 21.051 of the Texas Labor Code (Section 21.051).[20] *Compare* Def.'s Notice of Removal attach. (Pl.'s Original Compl. at 4) *with* Tex.Lab.Code § 21.051 *and Adams v. Valley Fed. Credit Union*, 848 S.W.2d 182, 186 (Tex. App.—Corpus Christi 1992), (writ denied) [21] *and Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609–10, 113 S.Ct. 1701, 1706, 123 L.Ed.2d 338 (1993).

28. Section 21.051 states that "[a]n employer commits an unlawful employment practice if because of ... age the employer ... discharges an individual." Tex.Lab.Code § 21.051 (colon, indentation and numbering omitted). This provision reaches only "discrimination based of age ... against an individual 40 years of age or older." *Adams*, 848 S.W.2d at 186.

29. Texas courts look to decisions in cases brought under the Age Discrimination in

Employment Act of 1967 (ADEA), a federal statute, to inform their review of age discrimination claims filed under the Section 21.051. *See Pina v. Texas Commerce Bank*, No. EP–95–CA–120–H, 1995 WL 857214, at *2 (W.D.Tex. Nov.13, 1995); *Trico Technologies*, 907 S.W.2d at 652–53; *Adams*, 848 S.W.2d at 186–87.

30. "In a disparate treatment suit [brought under the ADEA], the ultimate issue is whether the employer intentionally discriminated against the plaintiff." *Thornbrough v. Columbus and Greenville R.R.*, 760 F.2d 633, 638 (5th Cir.1985). "[L]iability[, therefore,] depends on whether [age] ... actually motivated the employer[ ]." *Hazen*, 507 U.S. at 609–10, 113 S.Ct. at 1706, 123 L.Ed.2d 338; *see Rhodes*, 75 F.3d at 994 ("If age does not motivate the employer's decision, then a 'discharge may well be unfair or even unlawful and yet not be evidence of age bias under the ADEA.' "). "Age need not be the sole reason for the adverse employment decision; however, 'a disparate treatment claim cannot succeed unless the employee's [age] ... actually played a role in ... [the employer's decisionmaking process] and had a determinative influence on the outcome.' " *Rhodes*, 75 F.3d at 994. An ADEA plaintiff "may use either direct or circumstantial evidence to prove" his or her disparate treatment claim. *Woodhouse v. Magnolia Hosp.*, 92 F.3d 248, 252 (5th Cir.1996).

31. Because Lupo points to no direct evidence that age influenced Wyeth's decision to release him, the burden-shifting analysis first announced in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), provides the framework for analyzing his disparate treatment claim. *Woodhouse*, 92 F.3d at 252. Under this approach, as refined for cases involving RIF's,

---

**19.** Lupo was not the only person subject to the sales force RIF to whom Wyeth presented the general release for consideration. *See* Resp. (Aff. of Henry Botter [hereinafter Botter Aff.] ).

**20.** " 'Disparate treatment ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their ... [age].' " *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S.Ct. 1701, 1705, 123 L.Ed.2d 338 (1993) (quoting *International Bhd. of Teamsters v. United States*, 431

U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1855 n. 15, 52 L.Ed.2d 396, n. 15 (1977)).

**21.** *Adams* concerned a claim filed under Article 5221k of the Texas Revised Statutes, which is "now codified as ... [Section] 21.051." *Trico Technologies Corp. v. Rodriguez*, 907 S.W.2d 650, 653 n. 1 (Tex.App.—Corpus Christi 1995); *see also Ewald v. Wornick Family Foods Corp.*, 878 S.W.2d 653, 659 (Tex.App.—Corpus Christi 1994) (writ denied).

he first must establish the following prima case of age discrimination:

(1) [T]hat he is within the protected age group; (2) that he has been adversely affected by the [Wyeth's] ... decision; (3) that he was qualified to assume another position at the time of the discharge; and (4) "evidence, circumstantial or direct, from which a factfinder might reasonably conclude that [Wyeth] .... intended to discriminate in reaching the decision at issue."

*Nichols v. Loral Vought Sys. Corp.,* 81 F.3d 38, 41 (5th Cir.1996). If he demonstrates a prima facie case, a presumption of age discrimination as to his discharge will arise. *Meinecke v. H & R Block of Houston,* 66 F.3d 77, 83 (5th Cir.1995). Wyeth and American then must provide a legitimate, nondiscriminatory reason for its decision to terminate him. *Rhodes,* 75 F.3d at 992–93; *see Nichols,* 81 F.3d at 41 (defendant can rebut prima facie case of discrimination "by presenting evidence that 'if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the [discharge]' "). If they satisfy this demand, then "the presumption [of discrimination] dissolves and [Lupo] ... must prove by a preponderance of evidence that [Wyeth's] ... articulated reason is but a pretext for age discrimination." *Armendariz v. Pinkerton Tobacco Co.,* 58 F.3d 144, 149 (5th Cir. 1995), *cert. denied,* 516 U.S. 1047, 116 S.Ct. 709, 133 L.Ed.2d 664 (1996). He must "show both that [Wyeth's] ... proffered reason is not credible; and show that an unlawful discriminatory intent motivated [Wyeth's] ... action" to establish pretext. *Ray v. Iuka Special Mun. Separate Sch. Dist.,* 51 F.3d 1246, 1249 (5th Cir.1995); *accord Trico Technologies,* 907 S.W.2d at 653; *see St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 2754, 125 L.Ed.2d 407 (1993) ("It is not enough, in other words, to *dis* believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination.").

32. Lupo establishes a prima facie case of age discrimination. He was fifty-three years old when he was released and his duties were assigned to a younger person whom he alleges to be less qualified than him. *See Thornbrough,* 760 F.2d at 641 n. 10, 643–44; *cf. Nichols,* 81 F.3d at 41.

33. Wyeth and American offer the following legitimate, nondiscriminatory reason for discharging Lupo: he met the criteria established to determine which particular sales representatives would be released to implement Wyeth's sales force RIF. *See Equal Employment Opportunity Comm'n v. Texas Instruments,* 100 F.3d 1173, 1181 (5th Cir. 1996); *Nichols,* 81 F.3d at 41; *Harvey v. Chevron U.S.A., Inc.,* 961 F.Supp. 1017 (S.D.Tex.1997); *Thomas v. Exxon, U.S.A.,* 943 F.Supp. 751, 754, 760 (S.D.Tex.1996). Lupo, consequently, must "raise a genuine issue of material fact as to whether he has established pretext ... to avoid summary judgment". *Nichols,* 81 F.3d at 41; *accord Moore v. Eli Lilly & Co.,* 990 F.2d 812, 817 n. 24 (5th Cir.1993) ("ADEA plaintiffs who fail to meet their burden to produce some valid evidence of pretext are unsuccessful"), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993).

34. Lupo offers eight arguments as to how the evidence raises a genuine issue about whether or not the explanation for his termination by Wyeth is a pretext. These assertions, however, prove insufficient to create a necessity for trial.

35. First, Lupo maintains that evidence showing Smith–Puig to possess lower qualifications than him raises a reasonable inference of pretext. Resp. at 5–6; Rejoinder at 4. This contention rests on an understanding of "qualification" different from that devised by Wyeth for determining whom to discharge to effect the sales force RIF. Wyeth delineated five criteria—1993 rating, 1994 rating, dollar amount of first 1993 salary bonus, dollar amount of second 1993 salary bonus and dollar amount of first 1994 salary bonus—as comprising its conception of "qualification" in that context.[22] *Supra* ¶ 10.

---

22. Lupo's evidence of "qualification" fails to coincide with Wyeth's definition of that term. First, he offers testimony by Bartek describing

Smith–Puig as "less qualified" to represent Wyeth. Resp. at 5–6; Rejoinder at 4. Such commentary proves nothing because Bartek nev-

The uncontroverted evidence discloses Smith–Puig's "qualification" to work as a sales representative as higher than that of Lupo under that definition.[23] *Compare supra* ¶ 10 *with supra* ¶ 23 *and supra* ¶ 26.

36. Second, Lupo cites data purportedly disclosing how Wyeth, beginning in 1993, adjusted sales figures to depress his overall performance appraisal rating scores and salary bonus awards relative to younger colleagues so that he would fail to survive the performance review used to identify which individuals to discharge in the sales force RIF.[24] Resp. at 6–8; *see* Rejoinder at 5, 6, 8; *cf.* Rejoinder at 10 (claiming that "[t]he lay-off plan was in motion in mid–1993"). He contrasts subtractions from the 1992 premarin tablet sales totals of two colleagues in his sales district, Doren L. Seimeca and Chester Messick, both of whom were under 40 at that time, to an addition to his 1992 premarin tablet sales figure. Resp. at 6–7; *see* Rejoinder at 5–6. He also highlights entries for 1993 premarin tablet prescription sales showing an addition to his figure and subtractions from those of Seimeca and Messick. Resp. at 8–9; *see* Rejoinder 5–6.

37. The undisputed evidence fails to show that Wyeth altered any of the sales information that Lupo offers. Although Wyeth sometimes adjusted sales data provided by IMS America, the uncontroverted evidence discloses that it made no changes to Lupo's 1992 premarin tablet sales figure, Wojcik Aff. ¶ 6; Klock Aff. ¶ 6, and nothing indicates that it took such action as to the premarin tablet prescription sales figures to which he points. Moreover, even if Wyeth revised the sales data to which Lupo points, he must produce more than a comparison between his sales and those of two of Wyeth's numerous sales representatives for one of the products that they marketed to create even an inkling of age-based discrimination.[25]

> Everyone [can] ... point to a comparison that ... make[s] the [employer] ... look bad, but the exercise would not show that age played a role. A plaintiff who wants a court to infer discrimination from the employer's treatment of comparable cases has to analyze a goodly sample. One is an anecdote, and several cases are several anecdotes. Judges do not find discrimination on such a thin basis. What a plaintiff ... must do is subject all of the employer's

er knew about Wyeth's notion of "qualification." *Compare supra* ¶ 11 *with Bradford v. Norfolk Southern Corp.*, 54 F.3d 1412, 1421 (8th Cir. 1995). Second, Lupo contrasts his 1992 overall performance appraisal rating score with that of Smith–Puig. Resp. at 6; Rejoinder at 3. In doing so, he ignores that performance appraisal rating scores for 1992, however, were not included in Wyeth's conception of "qualification." *See supra* ¶ 10. Finally, Lupo presents Smith–Puig's 1995 overall performance appraisal rating score of 2 (below expectations) as evidence of his superiority. Rejoinder at 3. But, like the 1992 scores, this rating is uninformative because Wyeth's definition of "qualification" fails to encompass it. *See supra* ¶ 10. *Compare* Rejoinder (Ex. 13 (Smith–Puig's 1995 Performance Appraisal at 1 (covering period from Mar. 1 to July 31, 1995)) *with supra* ¶ 12.

23. No direct comparison between Lupo and Smith–Puig on the five matters constituting Wyeth's notion of "qualification" proves possible because the record fails to impart Smith–Puig's first 1993 salary bonus, second 1993 salary bonus and first 1994 salary bonus. Smith–Puig Records (list of salary bonus totals by year for 1991 through 1995); Rejoinder (Ex. 2 (list of salary bonus totals by year for 1991 through 1995)).

24. Although it evaluates the sales data, the court notes that Lupo neither establishes himself as qualified to opine about the meaning of those figures, *see* Lupo Aff., nor discloses who made the mathematical computations that appear only in his response, *see* Resp. at 6–7 (line in premarin tablet sales table for "Actual $ Diff." and "Diff. $ ÷ or ± ") (line in premarin prescription sales table for "94 Actual $ × Diff." and "Scripts ÷ or ± to PYTD"). *See generally Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 460 (5th Cir.1996) (opinion testimony by lay witness); *Lavespere*, 910 F.2d at 175–77 (expert testimony); *Weiss v. Feigenbaum*, 558 F.Supp. 265, 269 n. 1 (E.D.N.Y. 1982) ("a motion for summary judgment cannot be defeated 'by factual assertions in the brief of the party opposing it, inasmuch as documents of this character are self-serving and are not probative evidence of the existence or non-existence of any factual issue' ").

25. While the record nowhere reports exactly how many persons comprised Wyeth's sales force, it indicates that this number at least approached two thousand. *See* Charts (Chart: Salesforce Distribution of Consistent Poor Performers).

decisions to a statistical analysis to find out whether age makes a difference.[26]

*Kuhn v. Ball State Univ.,* 78 F.3d 330, 332 (7th Cir.1996); *see Young v. Lincoln Nat'l Corp.,* 937 F.Supp. 1326, 1339 (N.D.Ind.1996) (sixty-one year old plaintiff's evidence showing "that every applicant interviewed for the upgraded position was younger than [him]" insufficient comparative evidence to raise inference of age discrimination); *see also Sprague v. Navistar Int'l Transp. Corp.,* 838 F.Supp. 1268, 1278 (N.D.Ill.1993) (disparate treatment case criticizing plaintiff's use of small samples to demonstrate a RIF's disparate impact on older employees), *aff'd,* 41 F.3d 1511 (7th Cir.1994); *cf. Nicholson v. Western Elec. Co.,* 555 F.Supp. 3, 6 (M.D.N.C.1982) ("[Plaintiff] has alleged that, of all the affected employees, two under forty, one black under forty, and one fifty-seven year old female should have been reclassified before he was. The Court is not convinced that this super-selective comparison is enough to establish a prima facie [disparate] treatment case in the face of such a major force reduction."), *aff'd,* 701 F.2d 167 (4th Cir.1983); *Hayden v. La–Z–Boy Chair Co.,* 838 F.Supp. 384, 390–91 (N.D.Ind.1992) (failure to establish similarity between sales territories made comparison between the percentage increase in plaintiff's total sales to the jump in a co-worker's percentage of total sales unhelpful), *aff'd,* 9 F.3d 617 (7th Cir. 1993), *cert. denied,* 511 U.S. 1004, 114 S.Ct. 1371, 128 L.Ed.2d 47 (1994).

38. Third, Lupo argues that evidence characterizing the sales figures as unreliable judicially estops Wyeth and American from asserting that the factors on which Wyeth relied to decide whom to terminate in the RIF, all of which related to those data in some way, *see supra* ¶ 10, notes 8 & 9, are nondiscriminatory. Resp. at 9–10. That evidence, however, fails to lead to the result he contemplates because, to prove discrimination based on age in discharging someone, "[i]t is not enough to show that [the] ... termination was based on incorrect information." *Ray v. Tandem Computers, Inc.,* No. 3:92–CV–2520–T, 1994 WL 854652, at *4 (N.D.Tex. Oct.24, 1994), *aff'd,* 63 F.3d 429 (5th Cir.1995); *see Garcia v. Fulbright & Jaworski,* Civ. A. No. H–95–0053, 1996 WL 544371, at *3 (S.D.Tex. Aug.15, 1996) ("Nor can a plaintiff prevail by showing that the information on which the adverse employment decision was made by the employer was misperceived or inaccurate, since the ADEA is not a vehicle for 'judicial second-guessing of employment decisions.'"); *cf. Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1257 (5th Cir.1977) ("Title VII (does) not protect against unfair business decisions—only against decisions motivated by unlawful animus").

39. Fourth, according to Lupo, the evidence refutes Wyeth's explanations for his release. Resp. at 10–11; Rejoinder at 4. Lupo points to testimony by Bartek stating that Smith–Puig "replaced" him as exposing the contention that Wyeth eliminated his job as disingenuous.[27] Resp. at 10. Bartek's

---

**26.** Members of Wyeth's sales force included in the performance review that identified which sales representatives to discharge to effect the RIF is the relevant population to draw a sample for a statistical analysis of alterations to the sales data. *See supra* ¶ 10. *Compare supra* ¶ 7 (OEP leading to the sales force RIF examined Wyeth's operations nationwide) *and* Minora Aff. (affidavit of Manager of Human Resources and Field Sales for Wyeth involved in the decisionmaking process regarding the RIF) *and supra* ¶ 11 (neither Wyeth district sales managers nor regional sales managers were involved in decisionmaking process regarding the sales force RIF) *with Texas Instruments,* 100 F.3d at 1185 (sample inexplicably drawn from a subgroup of persons over age 50 "not probative of age discrimination" because the relevant population was "all employees over 40 years old") *and Walther v. Lone Star Gas Co.,* 952 F.2d 119, 124 (5th Cir.1992) (observing that

"[p]articularly in age discrimination cases where innumerable groupings of employees are possible according to ages and divisions within corporate structures, statistics are easily manipulated and may be deceptive" and finding that analysis of layoffs at the regional level of the company unpersuasive because termination decisions were made at a higher echelon of the corporate structure).

**27.** Despite claiming that his job was not abolished, Lupo relies upon cases involving RIFs to support his various arguments. Resp. at 5 (citing *Thornbrough*); Resp. at 12 (citing *Haun v. Ideal Indus., Inc.,* 81 F.3d 541 (5th Cir.1996)); Rejoinder at 4 (citing *Texas Instruments*); Rejoinder at 5 (citing *Walther*); Rejoinder at 6 (discussing *Uffelman v. Lone Star Steel Co.,* 863 F.2d 404 (5th Cir.1989), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2448, 104 L.Ed.2d 1003 (1989));

statements, however, reveal little, if anything, because the uncontroverted evidence reveals that he lacked personal knowledge of what Smith–Puig's job following the RIF entailed.[28] *Compare supra* ¶ 26 *with Bradford,* 54 F.3d at 1421. *See generally Furr v. Seagate Tech., Inc.,* 82 F.3d 980, 988 (10th Cir. 1996) ("the test for position elimination is not whether the responsibilities were still performed, but rather whether the responsibilities still constituted a single, distinct position"), *cert. denied,* —— U.S. ——, 117 S.Ct. 684, 136 L.Ed.2d 608 (1997); *Thornbrough,* 760 F.2d at 637 (RIF case in which plaintiff's "position was eliminated and its duties divided up among" remaining personnel).

40. Lupo also maintains that his 1994 rating of 4 (exceeds expectations) exposes the contention that he was discharged for poor job performance as a sham. Resp. at 10–11. This claim overlooks the undisputed fact that, despite his strong showing in 1994, Lupo's "low" scores on the other performance criteria examined by Wyeth in deciding whom to release to implement the RIF dictated to his termination. *Supra* ¶ 23.

41. Fifth, Lupo posits that Wyeth's generation of charts reporting the sales force's average age before and after the RIF prior

to his discharge shows a reliance on age in choosing whom to terminate. to achieve the RIF.[29] Resp. at 11; Rejoinder at 9. *See generally supra* ¶ 13. But, as he offers no evidence creating any sense of when Wyeth selected the persons to discharge to effect the sales force RIF, the dates on those materials fail to acquire much probative value. *See Hedrick,* 658 F.2d at 1094 (citing survey of employee ages "conducted shortly before [defendant] . . . formulated its reorganization plan," along with other evidence, as proof sufficient to avoid a motion for judgment as a matter of law).

42. Sixth, to rebut the chart showing the average sales force age as declining after the RIF, *see supra* ¶ 13, Lupo points to evidence purportedly revealing that Wyeth employed young persons as sales representatives "after March 1, 1994, . . . to temporarily lower the average age of its sales force so that when the lay off occurred in early 1995 the termination of all the younger hires in 1994 would result in an overall increase in the average age of the sales force." Resp. at 11. But that proof actually fails to identify specifically those persons subject to the sales force RIF hired after March 1, 1994, or their ages.[30] The record, furthermore, nowhere

---

Rejoinder at 7 (citing *Texas Instruments*); Rejoinder at 9 (summarizing *Hedrick v. Hercules, Inc.,* 658 F.2d 1088 (5th Cir.1981)).

**28.** Wyeth and American properly characterize Lupo's assertion that he was "replaced" as frivolous. Reply at 7. When read in complete context, the passages from Bartek's deposition cited by Lupo reveal Bartek as uncertain about the fate of Lupo's position after the RIF. *See* Bartek Dep. at 109–112, 137. Moreover, Wyeth and American submit an uncontroverted affidavit from a Wyeth official involved in the decision to terminate Lupo, Minora Aff. ¶¶ 4–7, while Lupo's submits a list persons, including himself, entitled "Alphabetical RIF," RIF List, which he neglects to discuss in arguing that Wyeth actually replaced him, *see* Resp. at 10. *See Salmon v. Exxon Corp.,* 824 F.Supp. 81, 82 n. 2 (M.D.La. 1993); *cf. Douglas v. Pierce,* 707 F.Supp. 567, 572 (D.D.C.1988) ("Plaintiff's attorney's leading questions [during the deposition] and plaintiff's conclusory responses [in the deposition] provide insufficient foundation to support plaintiff's claim."), *aff'd,* 906 F.2d 783 (D.C.Cir.1990). *See generally Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

**29.** Two charts were produced on January 4, 1995, two others were generated on December 20, 1994, and two were created on unknown dates. Charts; Rejoinder (Ex. 18).

**30.** Lupo just submits a list of the 376 sales representatives losing their jobs as a consequence of the RIF. *See* Resp. at 11 (citing Ex. J, the "Alphabetical RIF"). Any belief on his part that the court will go through that list to find which of these individuals were hired after March 1, 1994, is mistaken. *See Forsyth,* 19 F.3d at 1537 (a nonmovant in the summary judgment context must "identify specific evidence in the record, and . . . articulate the 'precise manner' in which that evidence supports his [or her] claim"); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 (5th Cir.1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment"), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992); *Zoslaw v. MCA Distrib. Corp.,* 693 F.2d 870, 883 (9th Cir.1982) ("A party may not prevail in opposing a motion for summary judgment by simply overwhelming the district court with a miscellany of unorganized documentation,"), *cert. denied,* 460 U.S. 1085, 103 S.Ct. 1777, 76 L.Ed.2d 349 (1983).

reports the average age of Wyeth's sales force prior to March 1, 1994; without that information, no evidentiary basis exists for the factual predicate to the contention that Wyeth based hiring decisions after March 1, 1994, on a desire to decrease the sales force's average age. These two circumstances result in Lupo's claim that "younger employees ... [after March 1,] 1994[,] solely for the purpose of improving [sales force] statistics based on age," Resp. at 11, amounting to not much more than an unsubstantiated assertion.

43. Seventh, Lupo offers affidavits from three longtime Wyeth sales representatives ensnared in the RIF, Henry Botter, Randy Johnson and Ronald Westmoreland, as proof of age discrimination. Resp. at 11–12. These attestations, however, fail to add much to his case.[31] First, their respective conclusory statements that age explained the RIF possess offer little support. Botter Aff.; Johnson Aff.; Westmoreland Aff. See Armendariz, 58 F.3d at 152 ("We have traditionally been very cautious about self-serving and conclusory testimony based on a subjective belief that age discrimination occurred."); White v. Houston Indep. Sch. Dist., 815 F.Supp. 1016, 1018 (S.D.Tex.1993) ("a person's 'subjective belief of age discrimination, however genuine, cannot alone be the basis of judicial relief'" (quoting Sherrod v. Sears, Roebuck & Co., 785 F.2d 1312, 1316 (5th Cir.1986))). Second, the allegation made by both Johnson and Westmoreland that Wyeth never eliminated his position, Johnson Aff.; Westmoreland Aff,[32] proves unhelpful because nothing establishes that either of these former employees possess personal knowledge of how Wyeth reorganized its sales force following the RIF.[33] See Bradford, 54 F.3d at 1421; accord United States v. West, 22 F.3d 586, 592–93 n. 15 (5th Cir. 1994), cert. denied, 513 U.S. 1020, 115 S.Ct. 584, 130 L.Ed.2d 498 (1994); Hansard v. Pepsi–Cola Metro. Bottling Co., 865 F.2d 1461, 1466–67 (5th Cir.1989) (reviewing cases in which lay witnesses were "permitted ... to express opinions about motivation or intent if the particular witness has an adequate opportunity to observe the underlying circumstances"), cert. denied, 493 U.S. 842, 110 S.Ct. 129, 107 L.Ed.2d 89 (1989); see also Haun, 81 F.3d at 545, 548 (finding no error in the admission of a supervisor's opinion testimony regarding the release of older workers based on personal experiences with the defendant-employer).[34] Finally, a failure to recognize the appropriate group for assessing the RIF's impact diminishes Westmoreland's claim that the discharge of 2 of the 3 sales representatives in his sales district over fifty as part of the RIF, Westmoreland Aff, indicates age discrimination. See

---

31. Whether or not the court may even consider the affidavits of Johnson and Westmoreland is questionable because neither of those documents is an original. See Resp. (Aff. of Randy Johnson [hereinafter Johnson Aff.]) (Aff. of Robert Westmoreland [hereinafter Westmoreland Aff.]).

32. Botter makes no such charge. See Botter Aff.

33. Even if no personal knowledge problem existed, the cursory claims of Johnson and Westmoreland that their jobs never were abolished show little. Compare Johnson Aff. ("within a short period of time my position is [sic] filled by a young woman in her late twenties") and Westmoreland Aff. ("My position, which was not to be eliminated, was in fact not eliminated but filled with a new hire within 3 months.") with Davis v. Ceco Bldg. Sys., 813 F.Supp. 1202, 1205 (N.D.Miss.1993) (ADEA plaintiff's allegation in his EEOC charge that he had "learned that [his] ... position had been filled by a woman in her late 20's of early 30's," along with other evidence, insufficient to overcome defendant's summary judgment motion).

34. The affidavits of both Johnson and Westmoreland include the following statement: "[I am] competent under the law to give this affidavit and unless stated ha[ve] personal knowledge of the facts stated herein." Johnson Aff.; Westmoreland Aff. This declaration falls short of establishing personal knowledge about Wyeth's re-constitution subsequent to the sales force RIF because other evidence not only affords no indication of any such insight but also seems to suggest its absence. Compare supra ¶ 12 (laid-off sales representatives' active employment with Wyeth ended four days after they learned of their discharge and their relationship with Wyeth ceased completely two months after that date) with Johnson Aff. (reporting that his position was "filled" by someone else "within a short time") and Westmoreland Aff. (stating that someone "filled" his position "within 3 months"). See generally United States v. Davis, 792 F.2d 1299, 1304 (5th Cir.1986), cert. denied, 479 U.S. 964, 107 S.Ct. 464, 93 L.Ed.2d 409 (1986).

*supra* note 26; *see also Nochowitz v. Ernst & Young,* 856 F.Supp. 457, 466 (N.D.Ill.1994).

44. Lastly, Lupo argues that the general release suggests Wyeth's intent to discharge him because of age.[35] Resp. at 12–13. However, since he points to no evidence even intimating that Wyeth presented the general release only to sales representatives over age 40 subject to the RIF, this document proves little. *See Bradford,* 54 F.3d at 1421; *cf. DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 729–30 (3d Cir.1995), *cert. denied,* 516 U.S. 916, 116 S.Ct. 306, 133 L.Ed.2d 210 (1995); *Bodnar v. Synpol, Inc.,* 843 F.2d 190, 192–94 (5th Cir.), *cert. denied,* 488 U.S. 908, 109 S.Ct. 260, 102 L.Ed.2d 248 (1988).

45. Lupo fails to provide significant probative evidence to rebut the showing by Wyeth and American that his age played no role in the decision to terminate him. In other words, rather than "present[ing].... sufficient disagreement to require submission to a jury," the evidence regarding Lupo's age discrimination claim "is so one-sided that [Wyeth and American] ... must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d 202. Lupo's cause of action under Section 21.051, consequently, proves unable to survive the motion of Wyeth and American for summary judgment.

### *Intentional Infliction of Emotional Distress*

46. Lupo also alleges that Wyeth and American are liable to him for intentional infliction of emotional distress based on how Wyeth effected his discharge. Def.'s Notice of Removal attach. (Pl.'s Original Compl. at 4). To prevail on this claim, he must show the following: "1) [Wyeth and American] ... acted intentionally or recklessly, 2) [Wyeth's and American's] ... conduct was extreme and outrageous, 3) the actions of [Wyeth and American] ... caused [him] ... emotional distress, and 4) the emotional distress suffered by [him] ... was severe." *Twyman v. Twyman,* 855 S.W.2d 619, 621 (Tex.1993).

47. Wyeth and American assert that they should receive summary judgment because the evidence fails to establish Wyeth's conduct in precipitating Lupo's termination as outrageous. *See generally Wornick Co. v. Casas,* 856 S.W.2d 732, 734 (Tex.1993) (" 'It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery....' ").

48. In the context of intentional infliction of emotional distress, "[o]utrageous conduct is that which '[goes] beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Id.* Some consensus exists on this definition's limits. *Wagner v. Texas A & M Univ.,* 939 F.Supp. 1297, 1326 (S.D.Tex.1996). First, "behavior is not outrageous simply because it may be tortious." *Natividad v. Alexsis, Inc.,* 875 S.W.2d 695, 699 (Tex.1994). Second, "[l]iability [for intentional infliction of emotional distress] does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Wagner,* 939 F.Supp. at 1326 (citing cases). Finally, "[o]rdinary employment disputes do not rise to the level of ... outrageous behavior because, '[i]n order to properly manage its business, an employer must be able to supervise, review, criticize, demote, transfer and discipline employees.' " *Roark v. Kidder, Peabody & Co.,* 959 F.Supp. 379 (N.D.Tex.1997) (internal quotations omitted); *accord Johnson v. Merrell Dow Pharm., Inc.,* 965 F.2d 31, 33 (5th Cir.1992); *see also MacArthur v. University of Tex. Health Ctr. at Tyler,* 45 F.3d 890, 898 (5th Cir.1995) ("In the employment context, a claim for intentional infliction of emotional distress will not be supported by the broad range of conduct labeled as 'mere employment disputes.' "); *Wornick,* 856 S.W.2d at 735 ("the fact of discharge itself as a matter of law cannot constitute outrageous behavior"). Indeed, "[e]ven actions that may be illegal in an employment context may not be the sort of conduct constituting ... outra-

---

35. Neither Lupo nor Wyeth and American question the general release's admissibility. *See generally Cassino v. Reichhold Chem., Inc.,* 817 F.2d 1338, 1342–43 (9th Cir.1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 785, 98 L.Ed.2d 870 (1988).

geous conduct." *Wagner,* 939 F.Supp. at 1326 (citing cases).

■ 49. Wyeth and American posit that, even if Wyeth engaged in the activities that Lupo alleges, such conduct is not outrageous. *Compare* Mot. at 14 *with* Resp. at 14. Lupo offers three pieces of evidence to counter this contention. None of these, however, raise a genuine dispute about whether or not Wyeth's purported behavior was outrageous.

50. First, Lupo again points to sales figures supposedly altered by Wyeth to "cast him as an incompetent and ineffective sales representative." Resp. at 14; *see also* Rejoinder at 10, 11–12. That evidence, however, proves insufficient to support Lupo's claim that Wyeth manipulated sales data to harm him. *See supra* ¶¶ 36–37.

51. Second, Lupo maintains that, by giving him an overall performance appraisal score of 4 (exceeds expectations), Bartek consciously "created a false sense of security and gave [him] ... false hope because he lost his job some twenty (20) days later."[36] Resp. at 14; *see* Rejoinder at 12. The undisputed evidence, however, exposes the premise underlying this charge—that Bartek knew about the decision to release Lupo at the time of the 1994 evaluation—as erroneous.[37] *See supra* ¶ 11.

52. Finally, Lupo complains about a "threat" by defense counsel to subpoena his current employer for his personnel records if he refuses to produce them voluntarily.[38] Rejoinder at 10–11. This "threat," however, really entails nothing more than a somewhat aggressive effort to resolve a discovery matter without resort to a motion to compel.[39] Crowe Letter. *See generally* Fed.R.Civ.P. 37(a)(2)(A) (motion to compel disclosure "must include certification that the movant has in good faith conferred or attempted to confer with the party not making the disclosure in an effort to secure the disclosure without court action"); E.D.Tex.R. CV–7(h) ("Any judge of this Court may refuse to hear a motion relating to pre-trial discovery unless the movant advises the Court within the body of the motion that counsel for the parties have first conferred in a good faith attempt to resolve the matter by agreement").[40] As such, it hardly qualifies as outrageous conduct. *Cf. Thompson v. City of Arlington, Tex.,* 838 F.Supp. 1137, 1142, 1154 (N.D.Tex.1993) (defendant's refusal to reinstate plaintiff until plaintiff provided health care records requested by defendant after it had received psychologist's opinion questioning her mental fitness for regular duty as a police officer failed to constitute outrageous conduct); *Mattix–Hill v. Reck,* 923 S.W.2d 596, 598 (Tex.1996) (Texas Department of Human Services caseworker's telephone call to plaintiff about disappearance of plaintiff's daughter "was not 'ex-

---

**36.** The record provides no support for Lupo's assertion that only twenty days passed between Bartek's 1994 evaluation and the RIF's announcement. It, rather, discloses that nearly four months separated those two events. *Compare supra,* ¶ 12 *with supra* ¶ 21.

**37.** Even if true, neither of the first two misdeeds about which Lupo complains constitutes the kind of conduct that the tort of intentional infliction of emotional distress seeks to redress. *See Williams v. E.I. Du Pont De Nemours & Co.,* 955 F.Supp. 711, 718, 725 (S.D.Tex.1996) (allegations, including contention that company management altered plaintiff's personnel records, insufficient to state an intentional infliction of emotional distress claim); *Badgett v. Northwestern Resources Co.,* 818 F.Supp. 998, 1003 (W.D.Tex.1993) (conduct, including alteration of plaintiff's time cards, insufficient to support intentional infliction of emotional distress claim); *cf. Atkinson,* 84 F.3d at 151 (conduct, including dissemination within the company of false and defamatory reasons for plaintiff's discharge, in-

sufficient to state an intentional infliction of emotional distress claim).

**38.** Lupo presumably considers defense counsel to have acted as the agent of Wyeth and American in delivering this "threat." *See* Rejoinder at 10–11.

**39.** According to defense counsel, the "threat" was made because Lupo's attorney never kept a promise to produce the personnel records. Rejoinder (Ex. 19 (Letter from Crowe to Craddock of 4/30/97, at 1 [hereinafter Crowe Letter]).

**40.** Lupo knows about the need for counsel to engage in an good faith effort to resolve discovery disputes before bringing such matters before the court. *See* Order, filed Mar. 25, 1997 (directing the parties "to review *Shuffle Master, Inc. v. Progressive Games, Inc.,* 170 F.R.D. 166 (D.Nev. 1996), which explains the nature of a certificate of conference required by Federal Rule of Civil Procedure 37(a)(2)(B)").

treme' or 'outrageous' " but, rather, an appropriate execution of her official duties); *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995) ("Employers act within their legal rights in investigating reasonably credible allegations of dishonesty of their employees. This conduct is not 'beyond all possible bounds of decency,' 'atrocious,' and 'utterly intolerable in a civilized community'; rather, it is a managerial function that is necessary to the ordinary operation of a business organization."); *Lang v. City of Nacogdoches,* 942 S.W.2d 752 (Tex. App.—Tyler 1997) ("There is no liability for intentional infliction of emotional distress where an actor does no more than insist on his [or her] legal rights").

53. Lupo's intentional infliction of emotional distress claim fails to overcome motion of Wyeth and American for summary judgment because no evidence establishes Wyeth as behaving outrageously toward him.[41]

### Conclusion

54. The court grants defendants' motion for summary judgment [35].

55. The court will enter an order consistent with this memorandum opinion.

---

**41.** This determination makes unnecessary consideration of Lupo's argument that the record includes evidence "rais[ing] questions concern-ing [Wyeth's] ... intentional and reckless conduct," Resp. at 14–15.